**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **CHRISTY O'DONNELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CAUSE NO. 1:10-CV-00458** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Plaintiff Christy O'Donnell appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the

following reasons, the Commissioner's decision will be REVERSED, and the case will be

REMANDED for further proceedings in accordance with this Opinion.

**I.  PROCEDURAL HISTORY**

O'Donnell applied for SSI on January 3, 2007, alleging that she became disabled as of

February 1, 2006. (Tr. 137-40.)  The Commissioner denied her application initially and upon

reconsideration, and O'Donnell requested an administrative hearing. (Tr. 82-96.)  On September

14, 2009, Administrative Law Judge ("ALJ") Michelle K. Lindsay conducted a hearing at which

O'Donnell, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 29-

77.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

On December 11, 2009, the ALJ rendered an unfavorable decision to O'Donnell, concluding that she was not disabled despite the limitations caused by her impairments because she could perform a significant number of jobs in the national economy. (Tr. 14-24.) The Appeals Council denied O'Donnell's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.) O'Donnell filed a complaint with this Court on December 22, 2010, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. O'DONNELL'S ARGUMENTS

O'Donnell alleges several flaws with the Commissioner's final decision. Specifically, O'Donnell claims that the ALJ: (1) failed to consider her diagnosis of irritable bowel syndrome and analyze at step three whether this condition, in combination with her other conditions, met or equaled one of the impairments listed by the Commissioner; (2) improperly discounted her subjective symptom testimony, including her assertion that she would miss two or more days of work per month; and (3) failed to pose a hypothetical to the VE at step five inclusive of all of her limitations supported by the medical evidence of record. (Pl.'s Br. 2.)

## III. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, O'Donnell was thirty-seven years old; had a high school education and one year of college; and possessed work experience as a food service worker, housekeeper, and retail clerk. (Tr. 37, 137, 168.) She alleged in her SSI application that she was disabled due to fecal incontinence, anal stricture, anal stenosis, urinary incontinence,

---

[2] The administrative record in this case is voluminous (727 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

diabetes, depression, kidney disease, premenstrual dysphoric disorder, post traumatic shock syndrome, hyperlipidemia, and endometrial hyperplasia. (Tr. 185.)

O'Donnell stated at the hearing that she is five feet three inches tall and weighs between 190 to 197 pounds. (Tr. 35.) She lives in a one-story home with her husband and two children, ages seventeen and fifteen; her husband and children help perform the household tasks because of her limitations. (Tr. 35-36, 42.) O'Donnell's typical day includes performing some household tasks such as laundry, cooking, or dusting; using a computer from a reclined position; and taking a walk or running an errand with a family member. (Tr. 52-58, 60, 62.) She incorporates frequent rest breaks into her activities so that she can recline, and she often sleeps for an hour or two in the afternoon. (Tr. 52-58, 60, 62.)

When asked what physical conditions prevent her from working, O'Donnell responded that she fatigues easily and that any lifting, bending, or twisting causes "[r]ectal pressure", pain in her side, and bleeding around her colostomy. (Tr. 41-42, 63, 67.) She stated that she can walk about an hour and a half before she experiences pelvic cramps. (Tr. 45, 68.) O'Donnell testified that she has difficulty with sitting, particularly on hard surfaces, and that she needs to frequently lie down or recline on a couch. (Tr. 42, 44-45, 60.) She also reported that about once a month, she is ill from two to four days due to a colon blockage. (Tr. 43, 65-66.) In addition, O'Donnell testified that she experiences pain in her hands, which she suspects may be due to fibromyalgia. (Tr. 46-47.)

O'Donnell also confided that she suffers from depression for which she takes medication. (Tr. 48-50.) She stated that she does not relate well to people, has difficulty concentrating on tasks, and is forgetful. (Tr. 50-51, 54.)

*B. Summary of the Medical Evidence*

In 1992, O'Donnell experienced a fourth degree rectal tear during the birth of her

daughter, and she experienced problems with hemorrhoids thereafter. (Tr. 276.)  In 1999, she

was diagnosed with irritable bowel syndrome. (Tr. 276.)  In 2002, O'Donnell underwent a

hemorrhoidectomy, which resulted in some anal stenosis.[3] (Tr. 276.)

In November 2005, O'Donnell visited Dr. Paul Conarty at Northeast Indiana Colon &

Rectal Surgeons ("NEICRS") due to rectal bleeding and seepage, constipation, and other

abdominal problems associated with the anal stenosis. (Tr. 294-95.)  In January 2006, Dr.

Conarty performed an anoplasty surgery.[4] (Tr. 272-75.)  In the months following surgery,

however, O'Donnell experienced worsening bleeding after physical activity, fecal incontinence,

abdominal bloating and cramping, and alternating constipation and diarrhea, resulting in a trip to

the emergency room on March 12. (Tr. 267-71, 276-79, 341.)  In February 2006, Dr. Conarty

wrote O'Donnell an excuse from attending technical school due to her incontinence issues. (Tr.

348.)

In April 2006, O'Donnell was evaluated by Dr. Patrick Woodman and Dr. Thomas

Benson of Urogynecology Associates. (Tr. 276-79.)  They assigned her a diagnosis of anal

stenosis, fecal incontinence, irritable bowel syndrome with consistency problems, mixed urinary

incontinence, and relative hypoestrogenization or urogenital atrophy. (Tr. 278.)

On May 4, 2006, O'Donnell underwent an endoscopic ultrasound and removal of a rectal

---

[3] A stenosis is a narrowing or stricture of any canal or orifice. STEDMAN'S MEDICAL DICTIONARY1832 (28th ed. 2006).

[4] An anoplasty is a reconstruction of the anus that often involves advancement flaps. STEDMAN'S 97, *supra* n.3

polyp. (Tr. 299-300.) Following surgery, she reported continued rectal pain and fecal incontinence. (Tr. 336-38, 343.)

On May 23, 2006, O'Donnell was examined by Dr. Virendra Parikh, a partner of Dr. Conarty's at NEICRS, for a second opinion. (Tr. 341.) Upon examination, Dr. Parikh noted a concentric ring of fibrosis in the proximal anal canal, some muscle defect in the left lateral orientation, and extensive scarring. (Tr. 341.) He opined that she had "an irritable bowel syndrome component" to her condition and recommended that her irritable bowel syndrome be treated more aggressively before embarking on any surgical treatment. (Tr. 341.) Nevertheless, Dr. Parikh thought that ultimately O'Donnell would need a repair of her anorectal sphincter and possibly another advancement flap anoplasty. (Tr. 341.)

On June 6, 2006, O'Donnell visited the emergency room due to rectal bleeding and swelling. (Tr. 503-04.) Several weeks later, on June 22, she underwent anal manometry due to fecal incontinence. (Tr. 494.) On June 30, 2006, Dr. Conarty reported that O'Donnell was experiencing significant perineal pain with wiping, constipation, and liquid bowel movements with incontinence. (Tr. 338.) He agreed with Dr. Parikh that she would likely need a sphincter repair and possibly another flap anoplasty. (Tr. 338.)

In August 2006, O'Donnell saw Dr. Paul Raiman for a third opinion on her perianal problems. (Tr. 335.) He noted "extensive scarring with anal stenosis". (Tr. 335.) Dr. Raiman advised O'Donnell that it was "a very complex situation and unfortunately, many of her problems are compounded by her irritable bowel symptomology", which would make any surgical recovery and success "more tenuous." (Tr. 335.)

In September 2006, Dr. Conarty examined O'Donnell under anesthesia to help define her

5

anatomy and prepare for potential operative interventions. (Tr. 328-31.) He concluded that she would be best served by a three-dimensional ultrasound of the sphincter mechanism and pelvic floor at a more specialized facility. (Tr. 328-31.) Therefore, on December 18, 2006, O'Donnell was evaluated by Dr. Anders Mellgren at the Pelvic Floor Center in Minneapolis. (Tr. 371.) He concluded that she had several defects in the internal sphincter and a possible defect in the external sphincter, opining that she had a "complex injury to her sphincter complex." (Tr. 371.)

In January 2007, O'Donnell visited the emergency room for abdominal pain and constipation. (Tr. 483-85.) An acute abdominal series was negative, showing no significant stool or obstructive pattern. (Tr. 483-85.) In March, Dr. Conarty noted that O'Donnell continued to have postprandal bowel movements and rectal pain with a significant amount of bleeding. (Tr. 667.) She expressed interest in a colostomy but, due to her young age, Dr. Conarty encouraged her to exhaust the options for repair before proceeding with a colostomy. (Tr. 667.)

On March 21, 2007, Dr. J.V. Corcoran, a state agency physician, reviewed O'Donnell's record and opined that she could lift ten pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; perform unlimited pushing and pulling; frequently balance; occasionally climb stairs, stoop, kneel, crouch, and crawl; but never climb ladders. (Tr. 533-40.) A second state agency physician later affirmed this opinion. (Tr. 685.)

Also in March 2007, O'Donnell was examined by Rebecca Wages, Ph.D., who noted that she had intact memory, good concentration, and depressed mood. (Tr. 530-32.) Dr. Wages assigned O'Donnell a diagnosis of major depression and a General Assessment of Functioning

6

("GAF") score of 58.[5] (Tr. 530-32.) That same month, Joseph Pressner, Ph.D., a state agency psychologist, reviewed O'Donnell's record and opined that she was moderately limited in her ability to get along with coworkers and understand, remember, and carry out detailed instructions. (Tr. 541-43.) He opined that despite her mental impairments, she could perform simple, repetitive tasks. (Tr. 543.)

On April 25, 2007, Dr. Conarty reported that O'Donnell desired a colostomy. (Tr. 664.) He was reluctant to proceed with an abdominal perineal resection because of her young age, and thus offered her a laproscopically assisted sigmoid loop colostomy with cystoscopy and bilateral ureteral catheter placement. (Tr. 664.) Dr. Conarty opined, however, that if the loop colostomy did not help her symptoms, he would proceed with the permanent removal of her rectum. (Tr. 664.)

On May 5, 2007, O'Donnell visited the emergency room complaining of colon blockage, abdominal pain, and alternating diarrhea and constipation. (Tr. 622-28.)

O'Donnell saw Joyce Inskeep, a social worker, several times from March to June of 2007 for mental health counseling. (Tr. 641-53.) In March, Inskeep assigned her a current GAF score of 50 and a highest GAF in the past year of 58.[6] (Tr. 654.) In June 2007, Inskeep recited that O'Donnell had severe post traumatic stress disorder, depression, and anxiety, and opined that she

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

[6] A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). AMERICAN PSYCHIATRIC ASSOCIATION, *supra* n.5.

7

could not work due to the combination of her physical and mental impairments. (Tr. 641.)

On June 11, 2007, O'Donnell underwent colostomy surgery. (Tr. 671-78.) Her stoma worked well until the next month when she went to the emergency room due to an obstructive episode and abdominal cramping. (Tr. 661-62, 691.) In August, Dr. Conarty noted that O'Donnell had abdominal pain and continued bleeding from the stoma and rectum. (Tr. 690.) A colonoscopy performed in September showed some inflammation, which Dr. Conarty attempted to treat with medication. (Tr. 687-88.) In October, O'Donnell reported intermittent abdominal pain, abdominal swelling, and that she generally was not feeling well, particularly upon vigorous exercise. (Tr. 727.) Nonetheless, her stoma function was reasonable, and Dr. Conarty was satisfied with her progress. (Tr. 727.)

On January 18, 2008, however, O'Donnell visited the emergency room for abdominal pain, nausea, bloating, pressure, pain, fever, and poor colostomy function. (Tr. 721-28.) She was admitted for further observation by Dr. Conarty. (Tr. 722-23.) Nevertheless, the next month Dr. Conarty opined that O'Donnell could return to school without restrictions. (Tr. 720.) In March, however, O'Donnell continued to have cramping and bleeding into the stoma. (Tr. 718.) Dr. Conarty advised her that he would probably have to perform an extended lower anterior resection taking out her sigmoid and rectum down to the pelvic floor, which he thought would alleviate most of her bleeding and drainage symptoms. (Tr. 718.) Later that month, Dr. Conarty performed a sigmoidoscopy and colonoscopy and noted puckering of the skin, a poor seal on the stoma, and mild diversion colitis. (Tr. 716-17.)

On May 6, 2008, Dr. Conarty reported that O'Donnell had persistent bleeding from her rectum. (Tr. 714.) He suggested cystoscopy with bilateral urethral catheter placement,

colostomy revision, and rectosigmoid resection down to the pelvic floor. (Tr. 714.) On May 29, 2008, Dr. Conarty performed the stomal revision with low anterior resection and creation of a short Hartmann pouch to alleviate her bleeding and drainage. (Tr. 711-12.)

On July 2, 2008, Dr. Conarty noted that O'Donnell was "looking wonderful" and feeling well. (Tr. 710.) However, later than month, she was back in the emergency room with decreased colostomy function and abdominal cramps. (Tr. 708.) In August, Dr. Conarty documented that O'Donnell was doing well other than "sluggish GI function", and he released her to return to work without restrictions. (Tr. 706-07.)

In March and April 2009, O'Donnell again complained to Dr. Conarty of abdominal pain, rectal pressure, and drainage from the stoma. (Tr. 701-04.) On May 6, 2009, Dr. Conarty documented that O'Donnell experienced drainage about four times a week and that she felt pressure and irritation when she walks or sits. (Tr. 701.) The next month, he reiterated O'Donnell's discomfort with sitting and walking, problems with continuing drainage, and pain in her rectum. (Tr. 700.) He suggested a perineal proctectomy (removal of her rectum), but wanted to obtain a second opinion from Dr. Rairman before proceeding. (Tr. 700.) On May 12, 2009, Dr. Rairman evaluated O'Donnell and concluded that "very aggressive medical management under a variety of avenues" had failed to alleviate her symptoms, and thus that the only option for her was a completion proctectomy. (Tr. 699.)

On July 6, 2009, Dr. Conarty performed a complete proctectomy (removal of the rectum). (Tr. 695-96.) In an August 2009 letter, Dr. Conarty reported that once O'Donnell recovered from the surgery, he would not place any restrictions upon her activity. (Tr. 694.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## V. ANALYSIS

### A. *The Law*

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether O'Donnell is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[7] *See* 20 C.F.R. § 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B.  The ALJ's Decision

On December 11, 2009, the ALJ rendered her opinion. (Tr. 14-24.)  She found at step one of the five-step analysis that O'Donnell had not engaged in substantial gainful activity since her application date. (Tr. 16.)  At step two, she found that O'Donnell had the following severe impairments: anal stenosis, status post complete removal of the rectum with permanent colostomy placement, obesity, depression, and anxiety. (Tr. 16.)  At step three, she determined that O'Donnell's impairment or combination of impairments did not meet or equal a listing. (Tr.

---

[7] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945.  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

17-18.)  Before proceeding to step four, the ALJ found O'Donnell's subjective complaints not

credible to the extent they were inconsistent with the following RFC:

> [T]he claimant retains a residual functional capacity to perform light work . . . ;
> however, the claimant can never climb ladders, ropes, or scaffolds, but she can
> occasionally climb ramps and stairs, and she can occasionally balance, crouch,
> stoop, crawl, and kneel.  The claimant is also limited to the performance of
> simple, repetitive tasks.

(Tr. 18.)

Based on this RFC and the VE's testimony, the ALJ determined at step four that

O'Donnell was unable to perform her past relevant work. (Tr. 23.)  The ALJ then concluded at

step five that O'Donnell could perform a significant number of other jobs within the national

economy, including cashier, laundry folder, and packager. (Tr. 23.)  Therefore, O'Donnell's

claim for SSI was denied. (Tr. 24.)

### C.  The ALJ's Step Three Determination Was Inadequate

In her lead argument, O'Donnell challenges the ALJ's cursory finding at step three that

she did not have an impairment or combination of impairments that met or medically equaled a

listed impairment.  Specifically, O'Donnell contends that the ALJ erred by failing to discuss

whether she met or equaled listing 12.06, inflammatory bowel disease.  Ultimately, O'Donnell's

argument is persuasive.

The requirements of listing 5.06, in relevant part, are as follows:

> 5.06 Inflammatory bowel disease (IBD) documented by endoscopy,
> biopsy, appropriate medically acceptable imaging, or operative findings with:

> A. Obstruction of stenotic areas (not adhesions) in the small intestine or
> colon with proximal dilatation, confirmed by appropriate medically acceptable
> imaging or in surgery, requiring hospitalization for intestinal decompression or
> for surgery, and occurring on at least two occasions at least 60 days apart within a
> consecutive 6-month period.

12

20 C.F.R. Pt. 404, Subpart P, App. 1 § 5.06.

Although the claimant bears the burden of demonstrating that her impairments meet or medically equal a listing at step three, "an ALJ should mention the specific listings [s]he is considering and h[er] failure to do so, if combined with a 'perfunctory analysis,' may require a remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *see also Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) ("In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Here, the ALJ mentioned only listings 12.04, affective disorders, and 12.06, anxiety-related disorders, and her step-three discussion solely addressed O'Donnell's mental impairments.

That is, the ALJ failed at step three to identify listing 5.06, inflammatory bowel disease, by name, or for that matter, analyze whether O'Donnell's bowel impairments met or equaled such listing. *See Barnett*, 381 F.3d at 668 ("The ALJ never identified by name the listing relevant to [the claimant's] disability claim."); *Brindisi*, 315 F.3d at 786 ("[T]he ALJ's opinion does not even mention the specific listings under which it considered [the claimant's] impairments."); *Allen v. Barnhart*, 408 F. Supp. 2d 598, 602 (N.D. Ill. 2006) ("We have no way to determine if the ALJ applied the appropriate listing because [s]he does not refer to any . . . ."). Thus, the ALJ's consideration of whether O'Donnell's physical impairments satisfied or equaled listing 5.06 was nonexistent, that is even *less* than "perfunctory," since she failed to provide at step three "any explanation of why [O'Donnell's] bowel impairments are not severe enough to qualify as disabled within the meaning of the Act." *Allen*, 408 F. Supp. 2d at 602.

Indeed, the ALJ does not launch into any detailed discussion of O'Donnell's bowel impairments and the medical evidence concerning them until *after* she rendered her step three finding. (*See* Tr. 14-18.) Consequently, it is unclear from the ALJ's decision what impact the medical evidence of O'Donnell's bowel impairments had on her step three determination or whether the ALJ even considered this evidence at step three. *Brindisi*, 315 F.3d at 786 ("[T]he ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires h[er] to do." (quoting *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985))). Thus, the ALJ's step three finding concerning O'Donnell's bowel impairments is "devoid of any analysis that would enable meaningful judicial review." *Id*. ("The omission of any discussion of [the claimant's] impairment in conjunction with the listings frustrates any attempt at judicial review . . . .").

The Commissioner argues that, regardless of the ALJ's purported error at step three, O'Donnell's challenge to the ALJ's step-three finding is futile because her "abdominal problems were clearly linked to problems with her anus and rectum *and no physician definitively diagnosed her with irritable bowel disorder or syndrome*." (Def.'s Mem. 6 (emphasis added).) Of course, the Commissioner is simply wrong in this respect. O'Donnell's diagnosis of irritable bowel syndrome and her problems associated with the condition were specifically referenced by several physicians of record. (*See*, *e.g*., Tr. 276-78 (Dr. Woodman and Dr. Benson), 335 (Dr. Raiman), 341 (Dr. Parikh).)

Furthermore, the ALJ's failure to consider O'Donnell's bowel condition at step three is significant because the determination as to whether her impairments met or equaled the requirements of listing 5.06 (at least with respect to a closed period of disability from her

application date through August 2008, when Dr. Conarty released her to return to work without

restrictions, or July 2009, when she had the complete proctectomy) is not readily apparent from

the record.  Of course, even if an impairment fails to "meet" a listing by manifesting the specific

findings described in the listing, an impairment can "equal" a listing "if the medical findings are

at least equal in severity and duration to the listed findings." *McCall v. Heckler*, No. 84 C 9980,

1985 WL 3310, at *3 (N.D. Ill. Oct. 23, 1985 (citing 20 C.F.R. § 404.1526)); *see* 20 C.F.R. §

416.926; *Vujnovich v. Astrue*, No. 2:10-CV-43, 2011 WL 1157499, at *6 (N.D. Ind. Mar. 28,

2011) ("[A] claimant may . . . demonstrate presumptive disability by showing that h[er]

impairment is accompanied by symptoms that are equivalent in severity to those described in a

specific [l]isting."); *see, e.g.*, *Caldera v. Astrue*, No. EDCV 09-854, 2010 WL 2991484, at *2

(C.D. Cal. July 27, 2010) (awarding claimant a closed period of disability where her abdominal

disorder medically equaled the criteria of listing 5.06).

Therefore, the ALJ erred at step three by failing to mention listing 5.06, inflammatory

bowel disease, and by failing to analyze—in more than a perfunctory manner—whether

O'Donnell's bowel impairment or combination of impairments met or equaled listing 5.06.[8]

Consequently, this case will be remanded so that the ALJ may properly perform and minimally

articulate her analysis with respect to whether O'Donnell meets or equals listing 5.06.[9]

---

[8] Although in their briefing both the Commissioner and O'Donnell treat "inflammatory bowel disease" and
"irritable bowel syndrome" as interchangeable names for the same condition (*see* Pl.'s Br. 13; Def.'s Mem. 6), this is
not particularly accurate. *See, e.g.*, Cleveland Clinic, *Disease & Conditions, IBD and IBS: Q&A*,
http://my.clevelandclinic.org/disorders/Inflammatory_Bowel_Disease_IBD/hic_IBD_and_IBS_QandA.aspx (last
visited July 29, 2011).  On remand, the Commissioner should consider the distinction between the two conditions
when performing its new step-three analysis.

[9] Since a remand is warranted under O'Donnell's first argument, the Court need not reach O'Donnell's
remaining arguments.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of O'Donnell and against the Commissioner.

SO ORDERED.

Enter for this 1st day of August, 2011.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge